1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  IMPERIUM INSURANCE COMPANY, | )   Case No.: 1:13-cv-01707 - JLT |
| | ) |
| 12              Plaintiff, | )   ORDER GRANTING PLAINTIFF IMPERIUM |
| | )   INSURANCE COMPANY'S MOTION FOR |
| 13        v. | )   SUMMARY ADJUDICATION AND DENYING |
| | )   DEFENDANT UNIGARD INSURANCE |
| 14  UNIGARD INSURANCE COMPANY, et al., | )   COMPANY'S CROSS-MOTION FOR SUMMARY |
| | )   JUDGMENT |
| 15              Defendants. | ) |
| | ) |
| 16  _____ | )   (Docs. 34, 39) |

17          Imperium Insurance Company, formerly known as Delos Insurance Company ("Imperium") and

18  Unigard Insurance Company ("Unigard") have filed cross-motions for summary judgment or, in the

19  alternative, summary adjudication of Imperium's claims.  (Docs. 34, 39.)  The Court heard the oral

20  arguments of the parties on April 23, 2013.  For the following reasons, Imperium's motion for

21  summary judgment is **GRANTED**, and Unigard's cross-motion is **DENIED**.

22  **I.        Relevant Factual and Procedural History**

23          Imperium issued insurance policy number DTP7400107 to Juarez Brothers Tucking, Inc. and

24  Juarez Agri Mix Transport, Inc. (collectively, "Juarez"), for the period of March 1, 2010 to March 1,

25  2011.  (Doc. 1 at 3.)  According to Imperium, the policy "provides commercial auto liability insurance

26  to Juarez."  (*Id.*)  Specifically, Imperium alleges:

27          Under Coverage A, the Imperium Policy obligates Imperium to pay those sums that the
           insured legally must pay as damages because of "bodily injury" or "property damage," to
28         which the Imperium Policy applies, caused by an "accident," and "resulting from the
           ownership, maintenance or use of a covered 'auto.'"

                                                    1

(Doc. 1 at 3.)  Further, Imperium asserts Unigard Insurance Company "issued a multi-line commercial insurance policy, policy number CM004237 to Juarez for a policy period of March 1, 2010 to March 1, 2011." (*Id.* at 4, footnote omitted.)  Imperium alleges that the Unigard policy "provided commercial general liability insurance to Juarez." (*Id.*)

Imperium reports that an action entitled *Fernando Sanchez v. Seaco Technologies, Inc., et al.*, was filed on August 6, 2012 in Kern County Superior Court, Case No. S-1500-CV-277330-WDP. (Doc. 1 at 6.)  Juarez is identified as a defendant in the action, in which it is alleged:

> [O]n or about December 8, 2010, defendants IAN GALYAN, while in the course and scope of his employment with defendant SEACO TECHNOLOGIES, INC., and an individual known as "Mr. Pena," who himself was acting in the course and scope of his employment with defendant, AGRI-MIX TRANSPORT, INC., formally [sic] known as JUAREZ BROTHERS TRUCKING, INC.[] JUAREZ BROTHERS TRUCKING, INC., AND DOES 1 to 75, inclusive, and each of them, negligently, carelessly and recklessly and without permission accessed a restricted access road on the private business premises of Grimmway Farms wherein they unpinned a control pole gate and removed fixed barriers from the roadway and left the pole gate unattended pointed diagonally towards the expected pathway of oncoming traffic and thereby created an extreme danger to unwary motorists. That on said date and time Plaintiff, Fernando Sanchez, was driving a forklift on said access road unaware of the hazard and subsequently was impaled by the pole gate.[1]

(Doc. 1 at 7, Doc. 1-3 at 6.)  Imperium reports that it "is currently providing Juarez with a defense to the Underlying action," but asserts "Imperium has no duty to defend" because the plaintiff "alleges only injuries caused by acts relative to the operation of the pole gate." (*Id.* at 7-8.)  Imperium asserts, "Juarez formally tendered its defense and indemnity for the [state court action] to Unigard" on May 20, 2013. (*Id.* at 7.)  According to Imperium, "Unigard has taken the position that it does not understand why the Underlying Action is not covered under the Imperium Policy, but has not otherwise responded to Juarez's tender under the Unigard Policy." (*Id.*)

Based upon the foregoing, Imperium filed its complaint on October 23, 2013, seeking

---

[1] Imperium and Unigard jointly request that the Court take judicial notice of the allegations in the complaint filed in Case No. S-1500-CV-277330-LHB. (Docs. 43, 46.) The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  The record of state court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records. *Mullis v. United States Bank*. Ct., 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989). Therefore, the Court may take judicial notice of the allegations in the plaintiff's complaint in *Sanchez v. Seaco Technologies, Inc.*, Case. No. S-1500-CV-2773330-WDP, and the parties' joint request is **GRANTED**.

declaratory relief that: (1) Imperium has no duty to defend any insured in the state court action; (2) Imperium owes no duty to indemnify any insured in the state court action; (3) Unigard owes a duty to defend the insureds in the state court action; (4) Unigard owes a duty to indemnify the insureds in the state court action ; and (5) Imperium is entitled to reimbursement from Unigard for defending Juarez in the state court action.  (Doc. 1 at 7-10.)

On November 14, 2013, Unigard filed its answer to the complaint denying that its policy was implicated.  (Doc. 6 at 8.)  Accordingly, Unigard denied that Imperium was "entitled to the requested declaratory judgments, sums requested, or any relief from Unigard whatsoever."  (*Id.* at 10.)  In addition, Unigard filed counterclaims against Imperium, seeking judicial declarations that (1) Imperium has a duty to defend in the underlying action, and (2) even if there is a potential for coverage under the Unigard policy, "the Imperium policy is primary to the Unigard policy," and as such Imperium has a duty to defend and indemnify its insured parties.  (Doc. 7 at 8-9.)

On March 19, 2014, Imperium and Unigard filed the cross-motions for summary judgment now pending before the Court.  In its notice of motion, Imperium seeks judgment on its First, Second, Third and Fourth Claims for Relief, and a judicial determination that "Imperium has no duty under its policy to defend or indemnify any insured in the underlying action, and that such duties of defense and indemnity are properly the obligation of Unigard…pursuant to the terms of both the Imperium and Unigard policies."  (Doc. 34 at 2.)  On the other hand, Unigard seeks judicial determinations that it "owes no duty to defend Agri-Mix or any other insureds" and "owes no duty to indemnify Agri-Mix or any other insureds under the Unigard policy" in the state court action.  (Doc. 39 at 2.)  Rather, Unigard contends these duties belong to Imperium.  (*Id.*)

Imperium filed an opposition to Unigard's motion on March 24, 2014 (Doc. 47), to which Unigard filed a reply on March 31, 2014 (Doc. 52).  Unigard filed an amended opposition to Imperium's motion on March 25, 2014 (Doc. 50), to which Imperium replied on March 31, 2014. (Doc. 51.)

## II.     Declaratory Relief

The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations" of parties to a "case of actual controversy."  28 U.S.C. § 2201; *Spokane Indian Tribe v.*

*United States*, 972 F.2d 1090, 1091 (9th Cir. 1992); *see also Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 799 F.2d 1312, 1315 (9th Cir. 1986) (explaining the Declaratory Judgment Act "was enacted to afford an added remedy to one who is uncertain of his rights and who desires an early adjudication without having to wait until he is sued by his adversary").  The Court has the discretion to determine whether to entertain an action for declaratory relief, because the Declaratory Judgment Act "gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Public Affairs Associates v. Rickover*, 369 U.S. 111, 112 (1962); *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998).

   The Ninth Circuit determined that "[d]eclaratory relief is appropriate (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Eureka Fed. Sav. & Loan Assn. v. American Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989). Here, declaratory relief is appropriate because judgment will clarify which insurance policy covers the claim made in the underlying action.

   Moreover, despite that the underlying state action has not yet proceeded to judgment, the action here, to determine prospective liability as to the duty to indemnify, is ripe.  In *American States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir. 1994), the Ninth Circuit Court of Appeals specifically considered and determined that in cases of insurance coverage disputes related to the obligation to indemnify, the matter may be ripe for declaratory judgment.  The Court cited its earlier decision in, *Aetna Casualty and Sur. Co. v. Merritt*, 974 F.2d 1196, 1199 (9th Cir.1992) and held,

> First, we read *Merritt* to hold that a case or controversy existed in that action. *Merritt's* holding controls here as well. In *Merritt*, the insurer sought a declaration regarding its duty to defend and indemnify its insured in a pending state court liability suit. American States also seeks a declaration regarding its obligations in the pending state court liability suit against Tahoe Boat. Thus, *Merritt* controls our decision that there was a case or controversy when American States brought its declaratory judgment action to establish whether it had a duty to defend and to indemnify Tahoe Boat. In addition to *Merritt*, our conclusion follows from *Maryland Casualty v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), in which the Supreme Court held that an insurer's declaratory judgment action regarding its duty to defend and indemnify was sufficiently ripe, even when the underlying liability action in state court had not yet proceeded to judgment.
>
> Second, we read *Merritt* to hold that there is no per se rule against the district court exercising its jurisdiction to resolve an insurance coverage dispute when the underlying liability suit is pending in state court.

*American States*, 15 F.3d at 144-145.  Moreover, none of the *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942), factors—which caution against a court declaring rights, even where there is an actual controversy—are present here.  *Brillhart* instructs, "The district court should avoid needless determination of state law issues; it should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation."  *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998).

Here, the state law issues to be determined related to the duty to defend are the same as those needed for a determination of the duty to indemnify.  As a result, declining to decide the obligation to indemnify would not avoid determining state law questions.  Moreover, there is no attempt at forum shopping here.  The parties to this litigation are not parties to the underlying action and are not seeking to subvert the state court judgment.  Indeed, in the underlying action, the state court has no occasion to determine the issues presented here.  Thus, none of the *Brillhart* factors weigh against the exercise of jurisdiction.  Finally, the outcome of this case will not impact the state court case.  No matter how this case is decided, in the underlying action, the remedies sought, the theories of liability advanced and the defenses asserted will not be altered; this action is distinct and separate.

Given these considerations, the Court concludes that judicial economy demonstrates it may and should determine now whether or which party has an obligation to indemnify the insureds in the underlying action.

### III.    Standards for Summary Judgment/Adjudication

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, a court may grant summary adjudication, or partial summary judgment, when there

is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56; *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  The moving party demonstrates summary judgment is appropriate by "informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (citation omitted).

If the moving party meets its initial burden, the burden shifts to the opposing party to present specific facts that demonstrate a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits.  *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court may consider only admissible evidence.  *Orr v. Bank of America, NT & SA*, 285

F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## IV.    Undisputed Facts[2]

### A.    Underlying State Action

Fernando Sanchez initiated an action in which Agri-Mix Transport, Inc., formerly known as Juarez Brothers Trucking, Inc., and Juarez Brothers Trucking, Inc. ("Juarez") are identified as defendants.  (Doc. 37, SF 1.)  Sanchez "seek[s] damages for injuries he suffered on December 8, 2010 when he was impaled by an open gate while driving a forklift at Grimmway Farms Malaga."  (SF 1.)  Sanchez was injured by the west gate at Grimmway Farms.  (SF 22.)

Two portable barricades were placed in front of the west gate when it was closed.  (SF 38.)  Opening the gate required the removal of a locking pin.  (SF 43.)  "[O]nce open, the gate could be held open by re-insertion of the locking pin."  (SF 44.)  If the locking pin was not re-inserted, the gate would be free to move.  (SF 45.)  After the accident, Lola Marie Rameriz, the safety manager for Grimmway Farms "looked at birds-eye view pictures, as well as the pin and hinge in the gate itself."  (SF 47.)  She testified that it appeared "someone had tried to open and pin the gate facing the wrong way."  (SF 48.)

Vicente Pena went to Grimmway Farms on the day of the accident "to load and transport carrot products to farms as designated by Grimmway."  (SF 14.)  Pena was employed by Juarez, and the truck he drove was owned by Juarez.  (SF 11, 12.)  Pena testified that he drove though the west gate three times the morning of the accident, and each time "he looked back through his rear view mirror to make sure his tractor-trailer had not moved the gate." (SF 20, 24.)  The parties agree that "[t]he truck Pena was driving on the day of the accident was an 'auto' as that term is defined in both the Unigard and Imperium policies," both of which were in effect when Sanchez was injured.  (SF 3, 8, 13.)

///

---

[2] The parties provided stipulated facts in support of their cross motions for summary judgment (Doc. 37), which are designated as "SF," followed by the fact number.  In addition, the parties filed joint evidence in support of their cross-motions, including Unigard's insurance policy (Doc. 38-4) and Imperium's insurance policy (Doc. 38-5).

**B.      Unigard's Insurance Policy**

"Unigard issued Commercial Multi-Line Policy No. CM004237 to Juarez Brothers Trucking, Inc., Juarez Brothers Agri-Mix Transport Inc., and Juarez Brothers Investments LLC." (SF 3.)  The policy includes a Commercial General Liability Occurrence Coverage Part, which provides:

> [Unigard] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Unigard] will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(SF 4; Doc. 38-4 at 5.)

### 1.      Relevant definitions

Unigard provides the following definitions to terms used in its policy:

- "<u>Bodily injury</u>" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

- "<u>Loading or unloading</u>" means the handling of property:
  a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft, or "auto"; or
  b.  While it is in or on an aircraft, water or "auto"; or
  c.  While it is being moved from an aircraft, water or "auto" to the place where it is finally delivered.

- "<u>Occurrence</u>" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(SF 6; Doc. 38-4 at 20-22, emphasis added.)

### 2.      Exclusions

Unigard's policy contains an exclusion provision, which provides that the insurance policy does not apply to:

> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

(SF 4.)  This exclusion applies "even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the 'occurrence' which caused the 'bodily injury' or 'property damage' involved the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft that is owned or operated

8

by or rented or loaned to any insured." (SF 5.)

> ### 3.    Other insurance

The Unigard policy identifies its obligations "[i]f other valid and collectible insurance is available to the insured for a loss [Unigard] cover[s]" as follows:

> a.    Primary Insurance
> This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.
>
> b.    Excess Insurance
> (1) This insurance is excess over:
> (a) Any of the other insurance, whether Primary, excess, contingent or on any other basis:
> …
> (iv) If the loss arises out of the maintenance or use of aircraft, "autos," or watercraft to the extent not subject to paragraph 2. Exclusions g. Aircraft, Auto or Watercraft of SECTION 1 COVERAGES COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY of COMMERCIAL GENERAL LIABILITY FORM CG0001
>
> c.    Method of Sharing
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(SF 7, emphasis omitted.)

## C.    Imperium's Insurance Policy

"Imperium issued a Truckers Policy to Juarez Brothers Trucking Inc. and Juarez Agri Mix Transport Inc. which was in effect from March 1, 2010 to March 1, 2011." (SF 8.)  The Imperium policy provides the following liability coverage:

> [Imperium] will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident³" and resulting from the ownership, maintenance or use of a covered "auto".
>
> [¶]
>
> We have the right and duty to defend any "insured" against a "suit" asking for such damages…However we have no duty to defend any "insured" against a "suit"

---

³ The parties agree the underlying "bodily injuries" were caused by an "accident." (SF 11-20)  Moreover, at the hearing Imperium's counsel clarified that there is no dispute that in this regard.

seeking damages for "bodily injury" or "property damage"… to which this insurance does not apply.

(SF 9; Doc. 38-5 at 4-5.)  Those considered "insureds" included, but were not limited to (a) covered auto and (b) anyone using a covered auto that was owned, hired, or borrowed with the company's permission.  (Doc. 38-5 at 6.)

### 1.   Relevant definitions

Imperium provides the following definitions to terms used in its policy:

- "Auto" means:
  1. A land motor vehicle, "trailer" or semitrailer designated for travel on public roads; or
  2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

- "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

(Doc. 38-5 at 15-17, emphasis added.)

### 2.   Other insurance

The Imperium policy identifies its obligations where there is another insurance policy in effect, providing that Imperium's coverage would be "primary for any covered 'auto' while hired or borrowed by you and used exclusively in your business as a 'trucker' and pursuant to operating rights granted to you by a public authority."  (SF 10; Doc. 38-5 at 14.)  In addition the policy explains: "This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered 'auto' while hired or borrowed from you by another 'trucker.'"  (*Id.*)  Thus, Imperium's insurance was intended to be primary insurance for any auto owned by the insured, and excess insurance for any covered auto the insured did not own.  (*Id.*)

## V.   Interpretation of Insurance Contracts

Under California law, "interpretation of an insurance policy is a question of law."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (citing *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818 (1990)); *see also State Farm Fire & Casualty Co. v. Lewis*, 191 Cal.App.3d 960, 963 (1987) ("The interpretation of an insurance policy, like any other contract, is a matter of law as to which a reviewing court must make its own independent determination").  When interpreting the language of an insurance

policy, the Court "should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Industrial Indemnity Co.*, 112 Cal.App.3d 213, 218 (1980).  If a policy language is "clear and explicit, it governs." *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 (1992).

"[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (citation, internal quotations marks omitted); *see also Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002) (claims are construed liberally to determine whether they are covered by an insurance policy).

### A.    Duty to Defend

"An insurer has a duty to defend when the policy is ambiguous and the insured would reasonably expect the insurer to defend him or her against the suit based on the nature and kind of risk covered by the policy, or when the underlying suit potentially seeks damages within the coverage of the policy." *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal.4th 857, 869 (1998).  Whether an insurer has "[t]he duty to defend is determined by reference to the policy, the complaint, and all facts known to the insurer from any source." *Montrose Chem. Corp.*, 6 Cal. 4th at 300.  It is a "fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller*, 11 Cal. 4th at 19 (citing *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 (1966)).  In *Waller*, the California Supreme Court explained:

> *Gray* and its progeny have made it clear that the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy.  Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.

*Waller*, 11 Cal. 4th at 19 (citing *Gray*, 65 Cal. 2d at 276).

The duty to defend is "very broad" under California law.  *Anthem Electronics, Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1054-55 (9th Cir. 2002).  Consequently, an insurer's duty to defend "applies even to claims that are 'groundless, false, or fraudulent.'" *Waller*, 11 Cal. 4th at 19 (quoting *Gray*, 65 Cal. 2d at 267).  Because an insurer may owe a duty to defend its insured in an action in

which no damages ultimately are awarded," *Montrose*, 6 Cal.4th at 295, the duty to defend "is separate and broader than the insurer's duty to indemnify." *Waller*, 11 Cal. 4th at 19.

An insurer moving for summary judgment "'must establish the absence of any… potential'" for coverage, i.e., that the underlying complaint 'can by no conceivable theory raise a single issue which could bring it within the policy coverage.'" *Cunningham v. Univ. Underwriters*, 98 Cal.App.4th 1141, 1147 (2002) (quoting *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993)).  When an insurer seeks summary judgment "on the ground the claim is excluded," the insurer has the burden "to prove that the claim falls within an exclusion." *Roberts v. Assurance Co. of America*, 163 Cal.App.4th 1398, 1406 (2008) (quotations and citations omitted). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993).

### B.  Duty to Indemnify

"Although an insurer may have a duty to defend, it ultimately may have no obligation to indemnify, either because no damages were awarded in the underlying action against the insured, or because the actual judgment was for damages not covered under the policy." *Montrose Chemical Corp.*, 10 Cal.4th at 659, n. 9.  "Where there is a duty to defend, there may be a duty to indemnify; but where there is no duty to defend, there cannot be a duty to indemnify." *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 958 (2001).  The duty to indemnify "arises only when the insured's underlying liability is established." *Pardee Const. Co. v. Insurance Co. of the West*, 77 Cal.App.4th 1340, 1350 (2000); *see also Collin v. American Empire Ins. Co.*, 21 Cal.App.4th 787, 803 (1994) (an insurer has a "duty to indemnify only where a judgment has been entered on a theory which is actually (not potentially) covered by the policy").  Thus, the purpose of the duty to indemnify is "to resolve liability … *after* liability is established." *Certain Underwriters*, 24 Cal. 4th at 958.

### VI.  Discussion and Analysis

For purposes of these motions, the Court will assume that Vicente Pena opened the west gate at Grimmway Farms to drive a truck (owned by Juarez) through the gate, after which Fernando Sanchez was impaled by a pole of the gate.  Through the cross-motions before the Court, Imperium and Unigard seek a determination of which insurance company has the duties to defend and indemnify in the

underlying action.  Imperium provides coverage for bodily injury caused by an accident and "resulting from" the ownership, maintenance, or use of an auto.  On the other hand, Unigard's policy excludes coverage for bodily injury "arising out of" the use of any auto.

### A.      Use of the truck

Under California law, the word "use," "when used in a policy without restrictive terms, must be understood in its most comprehensive sense." *Columbia Southern Chemical Corp. v. Manufacturers & Wholesalers Indem. Exchange*, 190 Cal.App.2d 194, 202 (1961).  Thus, a use "includes 'loading and unloading,' even [when]… there is no specific provision covering such activities." *Truck Ins. Exchange v. Webb*, 256 Cal.App.2d 140, 144 (1967) (citing *Continental Cas. Co. v. Zurich Ins. Co.*, 57 Cal.2d 27, 33 (1961); *Cal. Steel Buildings, Inc. v. Transport Indem. Co.*, 242 Cal.App.2d 749, 753-754 (1966)).  The effect of a provision stating that use includes loading and unloading "expand[s] the term 'use of the vehicle' so that coverage will extend from the commencement of loading until the completion of unloading." *Webb*, 256 Cal.App.2d at 145.  Such a provision may "bring[] within the scope of the policy some actions in which the vehicle itself does not play any part." *Id.*

Imperium argues that "the opening and failure to either close or secure the gate in the open position, or to properly secure the gate in the open position, is not the operation or use of an auto." (Doc. 35 at 13.)  According to Imperium, "any act of Pena operating the gate, which would necessarily require stopping the truck and getting out to remove the locking pin and barriers, would not be the use of the auto, but the operation of the gate." (*Id.*)  On the other hand, Unigard argues that "use" "may apply though the insured vehicle is at rest" and "extends to any activity that utilizes the insured vehicle in the manner intended or contemplated by the insured."  (Doc. 40 at 14) (citing *Hartford Accident & Indem. Co. v. Civil Service Employees Ins. Co.*, 33 Cal. App. 3d 26, 31 (1973); *Pacific Indem. Co. v. Truck Ins. Exchange*, 270 Cal. App. 2d 700, 703 (1969)).  Unigard asserts:

> It is undisputed that on the day of the accident Pena was at Grimmway for the sole purpose of loading the truck with product, transporting it to other places as requested, and then returning with the truck to load it again and repeat the process.  Even if Pena opened the gate and left it open, creating the alleged hazard, it could only have been so he could drive the truck through it in the process of loading and transporting the product with the truck.  Whether he opened the gate is disputed, but even if he did it was a necessary part of using the truck.

(Doc. 40 at 17-18.)  According to Unigard, Pena "could not have driven the truck had the gate not been

13

open, and thus this was clearly necessary to use this truck for its intended purpose." (Doc. 48 at 20.)

It cannot be seriously disputed that the purpose of opening the gate was to drive the truck through to load products, or that the act of opening the gate was beneficial to the truck. In light of this fact, the Court concludes there was a "use" of the truck related to the events at issue, such to implicate the Imperium policy's coverage and the Unigard policy's exclusion.

## B.    Accident arising out of the use

"Although the word 'use' must be given an all-inclusive connotation, there must be a causal connection between the use and the injury." *Webb*, 256 Cal.App.2d at 145. Thus, for either the coverage or exclusion at issue here to apply, the bodily injury must arise out of the use of the truck such that there is a "causal connection between the use and the injury." *Truck Ins. Exchange,* 256 Cal.App.2d at 145; (citing *Gray*, 65 Cal. 2d at 274).

As the parties observe, "California cases have found that 'resulting from' and 'arising out of,' are similar, and that the cases interpreting 'arising out of' apply to both phrases."[4] (Doc. 35 at 10, n.3; Doc. 48 at 16) (citing *State Farm Mutual Auto. Ins. Co. v. Grisham*, 122 Cal.App.4th 563, 566 (2004)); *State Farm Mutual Auto. Ins. Co. v. Davis*, 937 F.2d 1415, 1419 (9th Cir. 2001). The phrase "arising out of" is broad, and is ordinarily understood to mean "incident to, or having connection with." *Hartford*, 33 Cal.App.3d at 32; *see also Continental Cas. Co. v. City of Richmond,* 763 F.2d 1076, 1080 (9th Cir. 1985) ("'Arising out of' are words of much broader significance than 'caused by.' They are

---

[4] Recently, in *Paroline v. United States*, ---S.Ct.---, 2014 WL 1612426 at *8 (April 23, 2014), The United States Supreme Court observed, "The words 'as a result of' plainly suggest causation." *Paroline* relied upon *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 681-682 (2012), in which a longshoreman was killed while working onshore despite that 98 percent of his time was spent offshore. His widow asserted that his death should have been covered by the Outer Continental Shelf Lands Act which provides workers' compensation benefits to those who suffer injuries "as the result of" operations that occur on the continental shelf. *Pacific Operators,* 132 S. Ct. at 687. The Court determined the phrase "plainly suggests causation" and determined that a "but for" level of causation is insufficient because it "would extend workers' compensation coverage to all employees of a business engaged in the extraction of natural resources from the OCS, no matter where those employees work or what they are doing when they are injured. This test could reasonably be interpreted to cover land-based office employees whose jobs have virtually nothing to do with extractive operations on the OCS. Because Congress extended LHWCA coverage only to injuries 'occurring as the result of operations conducted on the outer Continental Shelf,' we think that § 1333(b) should be interpreted in a manner that focuses on injuries that result from those 'operations.'" *Id*. at 690. As a result, the Court adopted the standard imposed by the Ninth Circuit Court of Appeals which required a showing of a "substantial nexus." *Id*. at 691. Notably, the Court found that the OCSA was designed to fill the gaps between coverage gaps for workers but not to create overlaps. *Id*. at 690.

Though in a different context and despite that coverage issues are to be interpreted expansively, *Paroline* and *Pacific Operators* are consistent with the majority of California Courts of Appeal which find that a causal connection between the use of a vehicle and the injuries must be greater than a "but for" relationship because this lesser test would turn an auto policy into a general liability policy.

ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having a connection with'").  The California Supreme Court explained:

> California cases have established beyond contention that this language of "arising out of the use," *when utilized in a coverage or insuring clause of an insurance policy*, has broad and comprehensive application, and affords coverage for injuries bearing almost any causal relation with the vehicle.

*State Farm Mutual Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 100-101 (1973) (emphasis in original).  However, the parties disagree regarding the requisite causal connection.

Imperium argues the Court should adopt the "predominating cause/substantial factor test," under which "a mere 'but for' connection between the use of the vehicle and the alleged injuries is insufficient to bring the claim within the scope of coverage."  (Doc. 35 at 11) (citing *Am. Nat'l Prop. & Casualty Co. v. Julie R.*, 76 Cal.App.4th 134 (1999); *R.A. Stuchbery & Others Syndicate v. Redlands Ins. Co.*, 154 Cal. App.4th 796, 802 (2007); *California Auto. Ins. Co. v. Hogan*, 112 Cal.App.4th 1292, 1297 (2003)).  Unigard argues that "under … established caselaw, for the accident to 'arise out of' the use of the truck it must only be 'incident to or have a connection with' the use of the truck."  (Doc. 40 at 18-19) (citing *St. Paul Mercury Ins. Co. v. Mountain W. Farm Bureau Mutual Ins. Co.*, 210 Cal.App.4th 645, 658-59 (2012); *Acceptance Ins. Co. v. Syufy Enterprises*, 69 Cal.App.4th 321, 328 (1999)).

In *Partridge*, the California Supreme Court examined whether a defendant's homeowner policy covered injuries sustained by a passenger after a gun, modified by the insured to have a hair trigger, discharged as he negligently drove the vehicle.  The court observed that "California cases uniformly hold that the 'use' of an automobile need not amount to a 'proximate cause' of the accident for coverage to follow."  *Partridge*, 10 Cal.3d at 100-101, n. 7 (citing, *e.g.*, *St. Paul Fire & Marine Ins. Co. v. Hartford Accident & Indem. Co.*, 244 Cal.App.2d 826, 831 (1966); *City of Santa Monica v. Royal Indem. Co.*, 157 Cal.App.2d 50, 54 (1958)).  Although the court compared *Universal Underwriters Ins. Co. v. Aetna Ins. Co.*, 249 Cal.App.2d 144, 145 (1967) with *Truck Ins. Exchange v. Webb*, 256 Cal.App.2d 140, 148 (1967), the court declined to clarify the level of causal connection required for the

injury to arise out of the use. *Partridge*, at 100-101, n.7.[5]  The California Supreme Court observed: "Although the vehicle need not be, in the legal sense, a proximate cause of the injury, the events giving rise to the claim must arise out of, and be related to, its use." *Id.* (quoting *Entz v. Fidelity & Casualty Co.*, 64 Cal.2d 379, 385 (1966)).

After *Partridge*, a number of California courts applied the "predominating cause/substantial factor test" to determine whether a claim was covered under an insurance policy.  *See, e.g., Stuchbery*, 154 Cal.App.4th at 802; *Grisham*, 122 Cal.App.4th at 566-67; *Julie R.*, 76 Cal. App.4th 134 (adopting the predominating cause/substantial factor test).  Despite this and without substantial analysis, the Ninth Circuit determined in *State Farm Mutual Auto. Ins. Co. v. Davis*, 937 F.2d 1415 (1991), that *Partridge* did not require that a 'use' of a vehicle "be the proximate cause of an injury in order to require coverage." *Id.*, 937 F.2d at 1419.  Rather, the Court found that under *Partridge*, "[i]t was sufficient if some minimal causal connection between the vehicle and an injury existed." *Id.*  In so finding, the Court explained:  "[w]hen the *Partridge* court said a use of an automobile need not be a proximate cause in order to require coverage as long as it was a minimal cause, we understand it to mean that the causal nexus need not be substantial." *Id.* at 1419, n.3.

On the other hand, in *Oregon Mutual Ins. Co. v. Nat'l Gen. Ins. Co*, the Ninth Circuit opined that "[a] vehicle's operation, movement, maintenance, loading, or unloading must be a substantial factor or predominating cause of the claimant's injury." *Id.*, 436 Fed App'x 802, 803 (2011).  The Court finds that *Oregon* provides a more considered approach and, as a result, it is bound by it given that it reflects the decisions of that the majority of California courts and there is no convincing reason to conclude the California Supreme Court would hold otherwise. *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008).

Significantly, whether the Court applies the "predominating cause/substantial factor" test or a lesser minimal causal connection between the use and the injury, it does not appear Sanchez's injury resulted from or arose out of the use of the truck. *See Davis*, 937 F.2d at 1421 (observing that "a

---

[5] While *Universal Underwriters* "does not require that the injury be the direct and proximate result in any strict legal sense of the active movement of the motor vehicle covered by the policy," *Webb* required use of the vehicle be "a predominating cause or a substantial factor in causing the injury." *Universal Underwriters*, 249 Cal.App.2d at 150 (citation omitted); *Webb*, 256 Cal.App.2d at 148 (internal quotation marks omitted).

1   tortfeasor leaving his vehicle prior to committing the tort might serve to break the causal nexus between

2   the use of the vehicle and the subsequent tort").  California courts have routinely held the use of a

3   vehicle as a mode of transportation to the scene of where an injury occurs is insufficient to establish a

4   causal connection between a vehicle's use and the injury for coverage under an automobile insurance

5   policy.  *See e.g., Rowe v. Farmers Ins. Exchange*, 7 Cal. App. 4th 964, 972 (1992) ("mere

6   transportation of a tortfeasor to a site where he commits a tort after departing from the uninsured

7   vehicle' does not establish the requisite causal relationship"); *Webb*, 256 Cal.App.2d at 145; *Julie R.*,

8   76 Cal.App.4th at 141; *Interinsurance Exchange v. Macias*, 116 Cal.App.3d 935, 938 (1981).[6]

9       Recently, in *Travelers Prop. Cas. Co. of Am. v. LK Transp., Inc.*, 2014 WL 996235 (E.D. Cal.

10  Mar. 13, 2014), this Court confronted similar arguments to those raised here.  In *Travelers*, the insured

11  "vehicle" was a trailer that the defendant was hired to pick up from Yuba and move to Sacramento.  *Id.*

12  at *1.  The accident occurred when the driver was en route to Yuba to pick up the trailer for transport.

13  *Id.*  The Court concluded that the auto policy covering the trailer was not implicated despite that the

14  *only reason the driver was on the road* was to retrieve the trailer from Yuba and move it to Sacramento.

15  *Id.* at *5. The Court held, "Although Prado and LK had the intention of eventually moving the Trailer,

16  it is undisputed that the Trailer had not been moved at the time of the accident. [Citation]  Finding that

17  an accident arose from the movement of a motionless vehicle would defy common sense and the laws

18  of physics."  *Id*.

19      Likewise, in *Webb*, the insured's employee used a truck to transport cardboard boxes that the

20  driver deposited on the ground and ignited, after which the driver "got into the truck and drove back…"

21  *Id.*, 256 Cal.App.2d at 142.  Fire from the boxes the driver ignited "spread to the buildings and

22  damaged or destroyed them."  *Id.*  The court was faced with the issue of "whether the destruction of the

23  buildings was a loss 'arising out of the use of any automobile.'"  *Id.* at 143.  The court observed, "The

24  automobile is so much a part of American life that there are few activities in which the 'use of an

25  automobile' does not play a part somewhere in the chain of events."  *Id.* at 145.  The court determined

26

27      [6] However, even this circumstance has not, necessarily, yielded predictable results in the state courts.  *Compare
     Ohio Casualty Ins. Co. v. Hartford Accident & Indemnity Co.*, 148 Cal.App.3d 641, 646 (1983) *with National Indemnity

28  Co. v. Farmers Home Mutual Ins. Co.* 95 Cal.App.3d 102 (1979).

requisite causal connection between the use and injury was not satisfied, explaining:

> [A]lthough the use of the pick-up truck did play a part in the chain of events, it cannot be reasonably said that the destruction of the buildings arose out of the 'use' of the vehicle. The conduct of Smith in igniting the boxes and leaving the fire unattended was independent of and unrelated to the use of the truck. The use of the truck was neither a 'predominating cause' or a 'substantial factor' in causing the injury.

*Id.*, 256 Cal.App.2d at 148.  Similarly, here, the truck played a part in the events because it was driven by Pena to Grimmway Farms.  Contrary to Unigard's assertion that "Pena's alleged conduct in opening the gate, and leaving it open, cannot possibly be construed as 'wholly disassociated from and independent of' the use of his truck" (Doc. 40 at 21), under *Webb*, opening the west gate was an independent act from the use—even if Pena resumed driving the truck after opening the gate, as the driver did in *Webb* after igniting the boxes.  The opening of the gate did not require the presence of the truck, although its driver benefited from the gate being opened and, indeed, the evidence shows that the reason for the gate being opened was to provide egress from the area where the truck loaded.

Relying in part on *Webb*, in *Julie R.*, the court explained the "[u]se of a vehicle as transportation to the scene of an injury does not establish a sufficient causal connection between the 'use' and the injury." *Julie R.*, 76 Cal.App.4th at 141.  In *Julie R.*, a woman was raped in the vehicle by the driver-owner of the car.  *See Julie R.*, 76 Cal.App.4th at 137.  Before the attack, the driver positioned the car against a fence so that the victim could not escape through her car door.  The victim made a claim against the auto policy which covered "bodily injury . . . [which] result from the ownership, maintenance, or use of the vehicle." *Id.*  The court concluded the injuries did not arise out of the use of the vehicle because its use was incidental to the attack and its use "for transportation to and away from the site . . . was not a substantial factor in the assault on Julie R." *Id.* at 141.

This Court relied in part upon *Julie R.* to determine whether an injury arose from the use of a truck in *Oregon Mutual Ins. Co. v. Nat'l Gen. Ins. Co.*, 2010 WL 1343529 (E.D. Cal. Apr. 5, 2010), *affirmed* 436 Fed. App'x. 802 (9th Cir. 2011).  The Court found an individual's injury did not arise out of the use of a vehicle when he leaned into the truck and was bitten by a dog that was inside. The Court explained that the truck was merely the site of the attack and was a mere fortuity given that the victim could have been bitten just as he walked on the sidewalk and leaned down toward the dog. *Id.*, 2010 WL 1343529 at *8 (citing *Ohio Casualty Ins. Co. v. Hartford Accident & Indemnity Co.*, 148

Cal.App.3d 641, 646 (1983)).  Similarly, here, the proximity of the truck and its use was a mere fortuity.  Put another way: though opening the gate may have been connected to the use of the truck, it was not dependent upon the use of the truck.  *See Travelers*, 2014 WL 996235 at *5 (The reason the negligence occurs is due to the need to drive the vehicle does not establish the injuries arose from the use of the vehicle).

Unigard argues that both *Julie R.* and *Oregon Mutual* should be distinguished because "[t]he whole reason Pena was there was to load the truck and transport product, he could not have driven the truck had the gate not been open, and thus this was clearly necessary to use the truck for its intended purpose."[7]  (Doc. 48 at 20.)  In addition, Unigard observes that in *Gradillas v. Lincoln General Ins. Co.*, 2012 U.S. Dist. LEXIS 171423, 2012 WL 6020094 (N.D. Cal. 2012), the Northern District court determined "a rape *did* arise out of the use of a bus."  (Doc. 48 at 20).  Significantly, however, the court in *Gradillas* was careful to note that the vehicle "was designed for social activity to occur on it, and promoted a party atmosphere" with "long padded benches, at least two bar areas, glasses, and bottles for storing alcohol."  *Id.*, 2012 WL 6020094 at *9.  The court found that "the manner of operating the vehicle directly contributed to the assault" because "it was being used for its party atmosphere, and features of the vehicle aided in the commission of the rape."  *Id.*  In contrast, here, no features of the truck contributed to the injury suffered by Sanchez.  Rather, it was used as a means of transportation to the west gate, where the alleged negligent operation of the gate occurred.

Further, Unigard relies upon cases in other jurisdictions to demonstrate that opening the gate, such as *Merchants Co. v. Hartford Acci. & Indem. Co.,* 187 Miss. 301, 192 So. 566 (1940).  (*See* Doc. 40 at 17; Doc. 48 at 26.)  Unigard observes that in *Merchants*, "a truck went into a ditch, and the operator used several poles to extricate it," after which the operator "drove away, leaving the poles," upon which a passenger in an automobile was injured.  (Doc. 40 at 17.)  The Mississippi court determined that an automobile insurance policy covered the injury, because the accident arose "out of the ownership, maintenance, and use of automobile."  *Merchants*, 187 Miss. at 307.  The court explained:

---

[7] The evidence submitted makes clear that Pena did not have to drive through the open gate to leave the area though this is the pathway chosen by him. (Doc. 38-6 at 13)

> The use of the poles in extricating the truck and thence the driving away and leaving the poles in the road thus had such a direct and substantial relation or connection in point of actual fact as respects the use and operation of the truck that in order to separate that use or break its continuity, we must interpose or insert, not an independent act, there being none such, but the negligent omission to remove the poles from the road, which, if allowed, would be to insert or interpolate into the contract a provision that liability shall follow only as to a strictly proximate cause; and, under familiar rules, we cannot rewrite the insurance contract by interpolating that provision therein.

*Merchants*, 187 Miss. at 309.  Significantly, however, *Webb* distinguished *Merchants*, explaining that "play[ing] a part in the chain of events" is insufficient under California law to satisfy the requisite causal connection between an injury and the use of a vehicle.  *Webb*, 256 Cal.App.2d at 147-148 ("although the use of the pick-up truck did play a part in the chain of events," the conduct of the driver in setting fire to the boxes and driving away was "independent of and unrelated to the use of the truck").  Moreover, here, of course, the truck did not act upon the gate in any fashion; it was not used to "nose" open the gate, nor did the truck touch the gate at any time before the injury.  (Doc. 38-6 at 14-16.)

In light of the above cases— in particular *Webb*, *Julie R.*, and *Ohio Casualty*— the Court finds Pena's act of opening the gate and leaving it open was independent of his use of the vehicle, because the *reason* the gate was opened fails to establish a sufficient causal connection between the injuries and the use of the truck.  Where "the particular injury which was suffered was of a type which could have occurred without the involvement of a vehicle and the vehicle in no way contributed to the injury," the injury does not "arise out of" the use of that vehicle.  *See State Farm Fire & Cas. Co. v. Kohl*, 131 Cal. App. 3d 1031, 1038 (1982).  Though the truck played a role in the chain of events, it was neither a predominating cause nor substantial factor in the injury suffered by Sanchez.  *See Julie R.*, 76 Cal.App.4th at 139 ("[m]ere use of a vehicle in some way connected to the events giving rise to the injury is insufficient to establish coverage"); *Ohio Casualty*, 148 Cal.App.3d at 648 (injury did not arise out of the use of a boat where the negligent act was *connected* to the use, but not *dependent* on the use).

### C.    Unigard has a duty to defend and indemnify in the underlying action

Because the injury did not "result from" or "arise out of" use of the truck, the exclusion found in Unigard's policy for commercial general liability insurance does not preclude the claim. As a result, Unigard has a duty to defend Agri-Mix Transport, Inc., formerly known as Juarez Brothers Trucking,

Inc., and Juarez Brothers Trucking, Inc. in the underlying action and, if liability is established as to any of the insureds, to indemnify.

### D. Imperium need not defend or indemnify in the underlying action

Under California law, "[t]he defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded, or until it has been shown that there is *no potential for coverage.*" *Montrose Chemical Corp.*, 6 Cal. 4th at 295 (emphasis in original). The California Supreme Court explained the duty "continues until the third party litigation ends, unless the insurer sooner proves, by facts subsequently developed, that the potential for coverage which previously appeared cannot possibly materialize, or no longer exists." *Scottsdale Ins. Co. v. MV Transp.,* 36 Cal. 4th 643, 657 (2005); *see also Hartford Accident & Indemnity Co. v. Superior Court*, 23 Cal.App.4th 1774, 1781 (1994) (holding that once duty to defend arises, an insurer "must defend until it obtains a declaratory judgment or summary judgment" that it no longer has duty to defend). Here, the facts have demonstrated that the injury suffered by Sanchez was not caused by an accident resulting from the use of the truck. Consequently, Imperium does not have a duty to defend in the underlying action, and it follows that Imperium could not have a duty to indemnify. *See Certain Underwriters at Lloyd's of London*, 24 Cal.4th at 958 ("where there is no duty to defend, there cannot be a duty to indemnify").

## VII.   Conclusion and Order

Based upon the foregoing, it is **HEREBY ORDERED**:

1.      Imperium's motion for summary adjudication is **GRANTED**;

2.      Unigard's motion for summary judgment is **DENIED**.


IT IS SO ORDERED.

Dated:   __April 28, 2014__                    _____/s/ Jennifer L. Thurston_
                                                          UNITED STATES MAGISTRATE JUDGE